UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
C.C.M.S. *d/b/a* COMMUNITY
COUNSELING and MEDIATION
SERVICES AND JEAN'S PLACE
HOUSING DEVELOPMENT FUND
CORPORATION,

                              Plaintiffs,                              **REPORT AND**
                                                                      **RECOMMENDATION**
              -against-                                               22 CV 3080 (RPK) (CLP)

THE CITY OF NEW YORK *acting through*
*the* NEW YORK CITY DEPARTMENT OF
HOUSING PRESERVATION AND
DEVELOPMENT,

                              Defendant.
-------------------------------------------------------X
**POLLAK**, United States Magistrate Judge:

On May 25, 2022, plaintiffs C.C.M.S. *d/b/a* Community Counseling and Mediation

Services ("CCMS"), and Jean's Place Housing Development Fund Corporation ("Jean's Place")

commenced this action against the City of New York (the "City")—acting through the New York

City Department of Housing Preservation and Development ("HPD")—seeking a declaratory

judgment, damages, and injunctive relief, pursuant to 42 U.S.C. § 1983, and the Declaratory

Judgment Act, 28 U.S.C. §§ 2201–2202. (Compl.[1]).  In their initial Complaint, plaintiffs CCMS

and Jean's Place, both not-for-profit corporations, challenged the constitutionality of a City

funding policy, promulgated by HPD.  (Id.)  Plaintiffs allege that HPD's acquisition cost funding

policy (the "Policy") is unconstitutional on its face and as applied to plaintiffs based on HPD's

refusal to waive the Policy's funding determination requirements with respect to the Jean's

Place's Project.  (See Compl. ¶¶ 7, 40, 42; id. at p. 11–12).

---

[1] Citations to "Compl." refer to the plaintiffs' Complaint filed on May 25, 2022. (ECF No. 1).

On August 31, 2023, the district court granted the defendant's motion to dismiss the Complaint for failure to state a claim, holding that the plaintiffs had not alleged a property interest protected by the Due Process Clause or plausibly alleged a violation of plaintiffs' right to equal protection sufficient to support their claim that the City had deprived them of rights secured by the Fourteenth Amendment to the Constitution.  (Order[2] at 4–6, 7–9).  The district court, however, gave plaintiffs the opportunity to seek to file an amended complaint within thirty (30) days of the court's Order.  (Id. at 10).

Currently pending before this Court is plaintiffs' Motion to Amend the Complaint to include additional facts to cure the defects identified in the district court's Order (the "Motion" or "Mot.").  (ECF No. 21).  For the reasons set forth below, the Court respectfully recommends that plaintiffs' motion to amend be DENIED as futile.

## BACKGROUND

I.  The Initial Complaint and District Court's Dismissal Order

Plaintiffs CCMS and Jean's Place provide supportive housing services to families and individuals in Brooklyn.  (Order at 2).  In 2015, at the request of the Department of Housing Preservation and Development ("HPD"), plaintiffs purchased a former industrial site in East New York for $975,000 in order to develop a supportive housing facility for homeless people, with a preference for the elderly (the "Jean's Place Project" or the "Project").  (Id.)  Although the property was zoned for manufacturing and located in the Industrial Business Zone, plaintiffs allege that HPD asked plaintiffs to develop the site and indicated that the area could be rezoned for residential use.  (Id.)[3]

---

[2] Citations to "Order" refer to the Order of the district court, dated August 31, 2023.  (ECF No. 17).
[3] Plaintiffs allege that over the next five years, they expended more than $1,250,000, demolishing three existing buildings on the property, removing contaminants, and obtaining a variance to allow the Jean's Place Project to proceed.  (Id.)

Plaintiffs sought financing from HPD's SARA Program, which provides low-interest financing to support the construction of housing for seniors.  (Id.)  Under SARA's "acquisition cost policy" (the "Policy"), the amount of funding available is based on the "lesser of [the property's] purchase price" and its "appraised value."  (Id.)  The policy does not take into account any "increased acquisition price from a private site rezoning."  (Id.)  Plaintiffs asked HPD to waive the acquisition cost policy to allow funding based on the property's appraised value, which was $7.5 million in 2020 and $6.9 million in 2022.  (Id. at 3).  Although HPD has the sole discretion to waive the acquisition cost policy as requested, it refused to do so for the Project and determined funding based on the plaintiffs' original purchase cost of $975,000.  (Id.)

In their initial Complaint, plaintiffs alleged that the City had violated their equal protection and due process rights by "selectively, arbitrarily and capriciously refusing to waive the acquisition cost policy."  (Id. (quoting Compl. ¶ 52)).  In granting defendant's motion to dismiss, the district court first examined plaintiffs' due process claim, explaining that while "[a]nticipated benefits from a government source may be entitled to due process protections," the plaintiffs must show "a legitimate claim of entitlement" to the benefit.  (Id. at 4 (internal citations omitted)).  As the Supreme Court noted in Town of Castle Rock v. Gonzalez, 545 U.S. 748, 756 (2005), "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  (See also Order at 4 (citing Sealed v. Sealed, 332 F.3d 51, 56 (2d Cir. 2003))).  The district court here, in reviewing plaintiffs' Complaint, found that there was no allegation that plaintiffs were denied funding guaranteed by SARA; rather, the HPD had "sole discretion" to waive the terms of the policy and chose not to.  (Id. at 5).  The court rejected plaintiffs' argument that HPD had "promised" to waive this policy, noting that not only is it unclear whether such a promise rises to the level of an entitlement, but also that the Complaint did not plausibly allege

3

any such promise.  (Id. at 5–6).  Plaintiffs' allegations that HPD encouraged plaintiffs to purchase the property and advised them regarding the timeline and process for rezoning merely meant that HPD "supported" the Project, not that HPD promised to waive the SARA Program's acquisition cost policy.  (Id. at 6).  According to the district court, the allegations in the Complaint as to plaintiffs' expectations regarding financing and their reliance on HPD's support "f[ell] short of plausibly alleging a constitutionally protected property interest."  (Id.)

As for plaintiffs' equal protection claim, the district court again found that plaintiffs had failed to plausibly allege that the refusal to waive the SARA Program's acquisition cost policy violated the Fourteenth Amendment.  (Id. at 7).  Specifically, the court found that plaintiffs had failed to state a selective-enforcement claim because the allegations were too conclusory to show that the "selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as . . . malicious or bad faith intent to injure a person."  (Id. at 7 (quoting Hu v. City of New York, 927 F.3d 81, 91 (2d Cir. 2019))).  As to a class-of-one claim under the Equal Protection Clause, the district court noted that while the Complaint alleged that HPD had previously waived the policy for other CCMS sponsored projects and that there were several prior developments where the appraised value had been used, plaintiffs had not identified any comparators with an "extremely high" degree of similarity to plaintiffs.  (Id. at 8–9).  The court explained that plaintiffs cannot simply allege in conclusory fashion that they were similar to a comparator; they "must provide details showing that the comparators are similarly situated." (Id. at 9 (quoting Contiguous Towing, Inc. v. State, 202 F. Supp. 3d 269, 276 (E.D.N.Y. 2016))).

Although the district court granted defendant's motion to dismiss, the court gave plaintiffs leave to file an amended complaint within thirty days.  (Id. at 10).  By Order dated October 17, 2023, the court granted the parties' joint motion to extend the time to file the fully

briefed motion to amend until December 29, 2023. Thereafter, the Motion was referred to the undersigned for Report and Recommendation. (Electronic Order, dated February 16, 2024).

II.   Plaintiffs' Proposed Amended Complaint

In moving to amend, plaintiffs have provided a Proposed Amended Complaint and Demand for Jury Trial, filed as an attachment to the Motion (the "Proposed Amended Complaint" or "PAC"). (ECF No. 21-3). Plaintiffs contend that the Proposed Amended Complaint provides a narrative detailing HPD's arbitrary and unfair behavior towards plaintiffs, including lying to City officials about HPD's involvement in CCMS's decision to purchase the property for the Jean's Place Project. (Pls.' Mem.[4] at 1–3; Pls.' Reply[5] at 1–2).

In their Proposed Amended Complaint, plaintiffs have added significant detail to the factual background and circumstances leading to the purchase of the lot, the representations of HPD's former director, the subsequent withdrawal of support for the Project by HPD, and the efforts and expenditures made by plaintiffs to persevere in pursuit of the Project. (PAC ¶¶ 4–11, 28–40, 45). Plaintiffs allege that in the first quarter of 2015, CCMS was approached by then-HPD Director Hodges ("Hodges"), who asked CCMS to purchase the site along Van Sinderen Avenue for use as senior housing while knowing that the site was located in the East New York Industrial Business Zone and would need to be rezoned. (Id. ¶¶ 28–31). Hodges allegedly "advised" plaintiffs that the site could be rezoned, and that "with the City driving the applications[,] a rezoning could be accomplished . . . in 6-9 months." (Id. ¶¶ 33–34). Plaintiffs now also allege that an adjoining City-owned industrial lot was rezoned within this time frame

---

[4] Citations to "Pls.' Mem." refer to plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Leave to File An Amended Complaint, filed December 29, 2023 (ECF No. 21-1).
[5] Citations to "Pls.' Reply" refer to Plaintiffs' Reply In Further Support of Motion For Leave to File An Amended Complaint, filed December 29, 2023. (ECF No. 21-7).

and that the City's Livonia Avenue Initiative—a series of affordable housing projects, including one adjacent to the Jean's Place lot—was completed in 2020.  (Id. ¶¶ 5, 36).

Plaintiffs allege that despite Hodges' supposed promise to expedite the rezoning process, the Jean's Place project received different treatment from City officials.  Specifically, plaintiffs describe the withdrawal of HPD support for the project after Hodges left HPD, and the actions of the new Deputy Director in asking if CCMS would develop a homeless shelter and a transit hotel on the site, in lieu of supportive housing for low-income seniors.  (Id. ¶¶ 36–40).  Plaintiffs further allege that the City's "duplicitous behavior caused substantial delay in the project being developed, which resulted in CCMS being damaged when HPD recognized the value of the lot at the time of purchase and not the current appraised market value."  (Id. ¶ 41).  However, with the backing of local elective officials, plaintiffs persevered in a six-year effort to rezone and develop the site.  (Id. ¶¶ 42, 45, 46, 48).  Plaintiffs claim that the variance and cleanup process took over six years at a cost in excess of $3.2 million in predevelopment expenses.  (Id. ¶ 55).  Moreover, during this period, the value of the lot had appreciated.  (Id. ¶ 51).  Plaintiffs assert that if "HPD made good on its promise to have the lot re-zoned in 6-9 months, the appreciation would not have been an issue." (Id. ¶ 51).

Plaintiffs attribute at least some of that success to the backing of Mayor De Blasio beginning in 2018.  (Id. ¶ 48).  According to plaintiffs, although the Mayor had been told by HPD that it did not support the Jean's Place Project, once he learned that HPD had "promised to assist in clearing the hurdles" to developing this project, the Mayor "pledged his support for Jean's Place, and directed his staff and HPD to resolve any problems in getting the lot approved for construction and the capital funding to pay for the construction and other soft costs."  (Id.) Allegedly as a result of the Mayor's support and CCMS's efforts, HPD reversed its position in a

letter dated February 20, 2020, and formally supported the zoning variance for Jean's Place.  (Id. ¶ 51).  However, when plaintiffs requested that HPD waive the purchase price provision in the SARA Program and use the current fair market value as the funding price for financing purposes, HPD refused.  (Id. ¶¶ 56–57).  In contrast to the acquisition price of $975,000, an appraisal dated December 8, 2020, determined that the fair market value of the site after rezoning and cleanup was $7.5 million.  (Id. ¶ 52).  By January 19, 2022, the appraised market value had dropped to $6.9 million, and then to $5.7 million as of September 13, 2023.  (Id.)  Thus, plaintiffs allege that "the lot has lost value on account of HPD's arbitrary and unreasonable application of its acquisition policy, further injuring CCMS."  (Id.)

Plaintiffs allege that the Policy—which allows HPD, at its discretion, to waive the requirement that the acquisition cost be determined with reference to the "lesser of" the purchase price and the current appraised market value—lacks "objective standards or rational basis, is arbitrary, capricious, and invites corruption."  (Id. ¶ 63).  According to plaintiffs, the Policy is particularly unfair where, as here, HPD asked the developer to create supportive housing.  (Id. ¶ 64).  Plaintiffs assert that if forced to sell the site to another developer for the current market value, plaintiffs will suffer a substantial loss and forfeit their developer's fee of approximately $10 million.  (Id. ¶¶ 65–67).  Plaintiffs allege that this "unfairly punishes and discriminates against Plaintiffs" for their efforts and expenditures to prepare the property, and that HPD's refusal to waive the "lesser of" provision in the Policy with respect to the Jean's Place Project is the result of HPD's "intent to punish CCMS for having complained about its policy with respect to acquisition costs."  (Id. ¶ 69).

The City opposes plaintiffs' motion to amend, contending that the Proposed Amended Complaint fails to cure the pleading defects identified by the district court in dismissing the first Complaint and fails to state any viable cause of action.  (Def.'s Mem.[6] at 1).

## DISCUSSION

I.   Legal Standard[7]

Pursuant to Federal Rule of Civil Procedure 15(a)(1), a party may amend "its complaint once as a matter of course within 21 days after serving the [original] complaint or within 21 days after a responsive pleading has been served." Blanchard v. Doe, No. 17 CV 6893, 2019 WL 2211079, at *3 (E.D.N.Y. May 22, 2019) (citing Fed. R. Civ. P. 15(a)(1)); see also Santagata v. Diaz, No. 17 CV 3053, 2019 WL 2164082, at *2 (E.D.N.Y. May 17, 2019).  After that, amendments are allowed "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).  While courts have broad discretion in deciding whether to grant motions to amend, Rule 15 expresses a strong presumption in favor of allowing amendment, stating that "[t]he court should freely give leave when justice so requires." Id.  Thus, the Second Circuit has cautioned that an amendment should only be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Bensch v. Estate of Umar, 2 F.4th 70, 81 (2d Cir. 2021) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)).

Leave to amend is considered futile "when the additional information [provided in the proposed amended complaint] does not cure the complaint" of previously identified deficiencies. WGH Communications, Inc. v. Penachio Malara LLP, No. 21 CV 570, 2022 WL 569665, at *1

---

[6] Citations to "Def.'s Mem." refer to defendant's Memorandum of Law in Opposition to Motion For Leave to Amend Complaint, filed December 29, 2023.  (ECF No. 21-4).

[7] Caselaw quotations in this Report and Recommendation accept all alterations and omit internal quotation marks, citations, and footnotes unless otherwise noted.

(2d Cir. Feb. 25, 2022) (quoting Mortimer v. Off Shore Servs., Ltd. v. Federal Republic of Germany, 615 F.3d 97, 114 (2d Cir. 2010)); see also Mario Badescu Skin Care, Inc. v. Sentinel Ins. Co., No. 22 CV 380, 2023 WL 6567266, at *3 (2d Cir. Oct. 10, 2023) (holding that "leave to amend is futile if the proposed amendment could not withstand a motion to dismiss" (quoting Balintulo v. Ford Motor Co., 796 F.3d 160, 164–65 (2d Cir. 2015))). Thus, "[i]n the absence of any indication that the plaintiff could—or would—provide additional allegations that might lead to a different result, the District Court does not err in dismissing the claim with prejudice." Mario Badescu Skin Care, Inc. v. Sentinel Ins. Co., 2023 WL 6567266, at *3 (quoting Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011)).

II.     Analysis

For the reasons set forth below, the Court concludes that amendment of the Complaint is futile, as the allegations in the Proposed Amended Complaint do not cure the deficiencies previously identified by the district court and there is nothing to suggest that plaintiffs could allege additional facts sufficient to do so.

A.     Plaintiffs' Due Process Claim

"To state a claim for a violation of substantive due process, a plaintiff must allege (1) a valid liberty or property interest and (2) that defendants infringed on that interest in an arbitrary or irrational manner." 20 Dogwood LLC v. Village of Roslyn Harbor, No. 23 CV 930, 2024 WL 1597642, at *1 (2d Cir. Apr. 12, 2024) (citing Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York, 746 F.3d 538, 545 (2d Cir. 2014)). "Anticipated benefits from a government source" cannot constitute a valid property interest when the individual has only an "abstract need or desire for," or "unilateral expectation of" the benefit. Kern v. Contento, No. 21 CV 1672, 2022 WL 1112767, at *1 (2d Cir. Apr. 14, 2022) (summary order) (quoting Town of Castle Rock v. Gonzales, 545 U.S. at 756). Rather, the individual must "have

a legitimate claim of entitlement to [the benefit]." Mordukhaev v. Daus, 457 F. App'x 16, 19 (2d Cir. 2012) (quoting Clubside, Inc. v. Valentin, 468 F.3d 144, 153 (2d Cir. 2006)). Such an entitlement does not exist "if government officials may grant or deny [the benefit] in their discretion," Town of Castle Rock v. Gonzales, 545 U.S. at 756, or "[w]here the [applicable] administrative scheme does not require a certain outcome, but merely *authorizes* particular actions and remedies," Sealed v. Sealed, 332 F.3d at 56 (citing Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170, 175 (2d Cir.1991)); see also XP Vehicles, Inc. v. Dep't of Energy, 118 F. Supp. 3d 38, 74 (D.C.C. 2015) (dismissing 1983 claim by loan applicant where the agency considering loan applications was given the authority "to make discretionary judgment calls and to move beyond strict technical requirements," finding that this sort of discretion prevents the "loan from becoming the type of government entitlement that creates a property interest in an applicant").

As noted above, the district court dismissed plaintiffs' due process claim on the ground that "the complaint d[id] not show that plaintiffs were deprived of a protectable property interest" when defendant refused to waive the Policy, as HPD had "sole discretion" over whether to do so, and the Complaint did not "plausibly allege" that HPD had promised to waive the "lesser of" term in the Policy. (Order at 5). Plaintiffs now assert that the facts alleged in their Proposed Amended Complaint demonstrate that in developing the Jean's Place Project, they had more than just a "unilateral expectation" of funding under the Policy on the basis of the lot's appraised value; rather, plaintiffs argue, they had an expectation that rises to the level of a protected property interest. (Pls.' Mem. at 5). Plaintiffs' argument fails for several reasons.

1.    Entitlement to Policy Waiver and Greater Funding

Plaintiffs have not and do not dispute that HPD maintains discretion over the application of the Policy, including whether to waive any of its requirements. (See PAC ¶ 60). Rather, Plaintiffs' original theory in support of its due process claim was that HPD arbitrarily refused to

waive the requirement to base its funding on the "lesser of [the property's] purchase price" and its "appraised value," after promising to do so and after doing so for other CCMS projects.  (See Compl. ¶¶ 6, 30–31).  The original Complaint contained only a single allegation regarding HPD's supposed promise to waive that requirement, stating that "[p]laintiffs relied on HPD's support and approval to move forward with the Jean's Place Project, including that the current appraised value of the land, and not the original purchase price, would be used as the approved acquisition cost when determining SARA Program financing for the project." (Compl. ¶ 6).  The district court concluded that this single allegation did not suffice, as it was "focused on plaintiffs' reliance and d[id] not actually state that defendant promised to waive the acquisition cost policy." (Order at 6).[8]

In the Proposed Amended Complaint, plaintiffs added numerous details regarding alleged promises made to them in connection with the Jean's Place Project, but they fail to allege that defendant or any of its agents promised to waive the "lesser of" requirement within the Policy. Rather, plaintiffs merely allege that they were approached by HPD Director Hodges; that Hodges asked plaintiffs to purchase the site even though he was aware it would need to be rezoned; that Hodges "advised" plaintiffs that the site could be rezoned; and that Hodges suggested that "with the City driving the applications[,] a rezoning could be accomplished . . . in 6-9 months."  (PAC ¶¶ 28–34).  The Proposed Amended Complaint notably does not allege that Hodges or anyone else "represented" or "promised" plaintiffs that the rezoning could be achieved within a defined time period, that HPD would waive its acquisition cost policy, or that plaintiffs would receive

---

[8] The district court noted in its dismissal order that "[i]t is not clear that . . . a promise" to waive the "lesser of" term in the Policy, even if adequately alleged, "would give rise to a protectible property interest." (Order at 5 (citing McMenemy v. City of Rochester, 241 F.3d 279, 286 (2d Cir. 2001))).  This Court need not address that issue, as the Proposed Amended Complaint still does not adequately allege that any such promise was made.

financing based on the site's current appraised value.[9]  As for plaintiffs' continued allegations that Hodges supported the Project and promised to expedite the rezoning process (id. ¶¶ 28–34, 38), the district court has already concluded that allegations regarding HPD's "encouragement" or "support and approval" of the Jean's Place Project "do not show that defendant promised to waive the SARA Program's acquisition cost policy."  (Order at 5–6).

Plaintiffs also added allegations regarding the Mayor's involvement in the project, which they now claim "began in 2018 when he met with Council Member Inez Barron (the local member of the City Council) concerning Jean's Place."  (PAC ¶ 48).  Council Member Barron allegedly "advised Mayor De Blasio that HPD was not helping with this project" even though "there was evidence that HPD had asked CCMS to purchase the [s]ite and promised to assist in clearing the hurdles standing in the way of its development as supportive senior housing."  (Id.)  Plaintiffs claim that "Mayor De Blasio thereupon pledged his support for Jean's Place, and directed his staff and HPD to resolve any problems in getting the lot approved for construction and the capital funding in place to pay for the construction and other soft costs."  (Id.)  Plaintiffs claim that "[t]he CCMS team understood that the Mayor meant for both parties to negotiate a compromise—CCMS would not get the full $7.5 million appraisal value but HPD would not refuse any amount over $1 million—and not that HPD [would] insist that CCMS bear the costs incurred to date and forfeit $6 million in the appreciated value."  (Id. ¶ 49).  These allegations likewise fail to establish an entitlement to greater funding than CCMS was ultimately awarded.

As an initial matter, the new allegations regarding CCMS's understanding that the parties would "negotiate a compromise" are at odds with plaintiffs' allegation that CCMS, rather than

---

[9] The lack of any such allegations is particularly telling given that, in describing a different CCMS project with respect to which HPD recognized the current appraised value—which was greater than the purchase price—as the acquisition cost, plaintiffs now specifically allege that HPD "stated . . . that [it] would provide financing to develop it at its current appraised value."  (Id. ¶ 15).

initiating such negotiations, "requested that HPD . . . recognize . . . the current fair market value of the [s]ite as the acquisition price." (Id. ¶¶ 49, 56). They are also at odds with plaintiffs' claim that throughout the life of the Project, CCMS believed HPD would rely on the full fair market value of the site when determining funding. (Id. ¶¶ 17, 56, 57, 62, 88). Moreover, CCMS's own understanding of the Mayor's comments, without more, is nothing but a "unilateral expectation" of a benefit and therefore does not suffice to establish a cognizable property interest. Town of Castle Rock v. Gonzales, 545 U.S. at 756.

Next, plaintiffs allege that by providing financing based on the current appraised value for two other CCMS projects—Ruby's Place and Georgia's Place—HPD established a "precedent" of doing so, and that plaintiffs "relied upon a consistent and rational application of this precedent." (PAC ¶ 17; see also id. ¶¶ 57, 62, 88). Plaintiffs further argue that by asking CCMS to purchase the lot and promising to help get the lot rezoned, as HPD had done with Ruby's Place and Georgia's Place, defendant "created a legitimate expectation that CCMS would develop the project along the same lines as the two prior HPD supportive housing projects identified in the PAC;" i.e., that HPD would waive the acquisition cost Policy for Jean's Place. (Pls.' Reply at 3 (citing PAC ¶¶ 4, 7–8, 11, 28–31, 33–34)). Plaintiffs thus claim that they "were shocked and damaged by HPD's refusal to recognize the current appraised value of the [s]ite for acquisition cost purposes, in light of the fact that HPD asked CCMS to purchase the [s]ite and promised to help with the re-zoning." (PAC ¶ 58).

However, plaintiffs do not and seemingly cannot allege that HPD was under any obligation to treat the Jean's Place Project similarly to CCMS's other projects with respect to the determination of acquisition cost under the Policy. (See id. ¶ 60 (recognizing that HPD retained "sole discretion" to decide on whether to waive the "lesser of" requirement)). Indeed, plaintiffs

themselves acknowledge that this was little more than an "expectation" on CCMS's part based on HPD's prior conduct.  (Pls.' Reply at 3).  As defendant rightly argues, no matter how rational that expectation may have been, "frustrated expectations do not rise to the level of a property interest."  (Def.'s Mem. at 7 (citing Castle Rock v. Gonzalez, 545 U.S. at 756, Sealed v. Sealed, 332 F.3d at 56–57, and Dean v. Town of Hempstead, 527 F. Supp. 3d 347, 423–24 (E.D.N.Y. 2021))).  It is thus irrelevant whether HPD acted irrationally or arbitrarily by failing to treat similar CCMS projects similarly when determining acquisition cost—an issue on which this Court expresses no opinion—as plaintiffs have not established that they had a "legitimate claim of entitlement" to waiver of the Policy's "lesser of" requirement.  Mordukhaev v. Daus, 457 F. App'x at 19.

In sum, the Proposed Amended Complaint does not allege that plaintiffs were guaranteed the funding that they seek, and it is devoid of any promise or representation made by Hodges, HPD, the Mayor, or his staff that plaintiffs would receive financing based on the site's current appraised value.  The absence of any allegation of such a promise is fatal to plaintiffs' due process claim, even assuming that such a promise or representation would qualify as an entitlement.  Thus, plaintiffs' due process claim premised upon HPD's exercise of discretion not to waive the "lesser of" term of the Policy still fails.

### 2.    Existence of a Special Relationship

Plaintiffs also claim that they were in a "special relationship" with the City as a result of the Mayor's involvement in the Project, such that plaintiffs were constitutionally entitled to particular treatment of which they were deprived by defendant's actions.  (Pls.' Mem. at 6 (citing Robischung-Walsh v. Nassau County, 421 F. App'x 38, 40–41 (2d Cir. 2011) (summary order))).  Defendant contends that plaintiffs' reliance on Robischung-Walsh v. Nassau County is misplaced.  (Def.'s Mem. at 8).  This Court agrees.

As the Second Circuit explained in Robischung-Walsh, "involuntary custody [is] the linchpin of any special relationship exception." 421 F. App'x at 40 (quoting Matican v. City of New York, 524 F.3d 151, 156 (2d Cir. 2008)).[10]  Plaintiffs' allegations are simply that HPD followed the terms of the Policy; these allegations do not rise to the level of conduct that would support relief under the Second Circuit's "special relationship" exception, nor have plaintiffs cited any cases in which such an exception has been applied to corporate entities.  The Court thus concludes that plaintiffs have not established that they entered into a special relationship with the City for purposes of their due process claim.

3.   Plaintiffs' Property Interest in the Project as a Whole

Finally, perhaps recognizing their inability to establish an entitlement to a waiver of the Policy's requirements, plaintiffs now argue that they have identified a cognizable property interest "not in the loan *per se*, but in the entire Jean's Place project."  (Pls.' Reply at 2; see also Pls.' Mem. at 2 (claiming that "[p]laintiffs have a legitimate claim of entitlement to the underlying supportive senior housing project")).  Specifically, plaintiffs argue that they "had a legitimate expectation to develop [the Project] after acting in reliance on HPD's representations" and directions to purchase the property, as well as Hodges' promise to smooth the path to its development, and that "the City has deprived [p]laintiffs of their interests in the project itself." (Pls.' Reply at 2).

---

[10] Robischung-Walsh involved a Section 1983 claim brought by the wife of the late Dennis T. Walsh, who took his own life after allegedly suffering from undiagnosed cumulative post-traumatic stress disorder ("CPTSD") during the course of his sixteen-year career with the Nassau County Police Department ("NCPD").  421 F. App'x at 39–40.  Plaintiff claimed that the NCPD had failed to train her husband and other officers on suicide prevention and the effects of CPTSD, and that the NCPD's deliberate indifference towards her husband gave rise to a substantive due process claim based on her husband's special relationship with the NCPD. Id. at 40.  In a summary order, the Second Circuit rejected plaintiff's special relationship argument, reasoning that such relationships, at least for due process purposes, arise only in the context of involuntary custody, that plaintiff's husband had "voluntarily accepted[] an offer of employment," and that "[s]ubstantive due process does not support constitutional liability for claims based solely on a governmental entity's alleged failure to provide its employees with a safe working environment." Id. at 40 (citing Collins v. City of Harker Heights, 503 U.S. 115, 126, 128 (1992)).

However, plaintiffs do not explain how they have been deprived of this interest, even assuming that it exists.  The Proposed Amended Complaint does not allege that plaintiffs will be forced to lose or abandon the property as a result of HPD's funding decision, nor does it allege any other facts indicating that plaintiffs have otherwise been or will be deprived of their interest in the site where Jean's Place is to be built.  Rather, plaintiffs merely allege that they have expended millions of dollars to rezone and clear the space, and that because of HPD's funding policies, they can only develop the Project "at a substantial loss."  (PAC ¶¶ 55, 67–68).  Absent any suggestion that plaintiffs were entitled to reap specific profits from developing the Project, or that they are no longer permitted to develop the Project at all, this new theory also fails to articulate a cognizable property interest upon which a due process claim may be based.  See, e.g., Mordukhaev v. Daus, 457 F. App'x at 19.

      B.      <u>Plaintiffs' Equal Protection Claim</u>

Plaintiffs also raise an equal protection claim against defendant under both a selective enforcement theory and a class-of-one theory.  To prevail on a selective-enforcement claim, "a plaintiff must prove that (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as . . . malicious or bad faith intent to injure the person." <u>Hu v. City of New York</u>, 927 F.3d at 91 (quoting <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 683 (2d Cir. 1995)).  To prevail on a "class-of-one" claim, a plaintiff must prove "(1) that she has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment."  <u>Id.</u> (quoting <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000)).  Both theories "require a showing that the plaintiff was treated differently from another similarly situated comparator," albeit with differing levels of similarity.   <u>Id.</u> at 93.  As set forth below, plaintiffs' equal protection claim fails under both theories.

16

1.      Selective Enforcement Theory

The Proposed Amended Complaint does not adequately state a selective enforcement claim.  The Proposed Amended Complaint alleges that "[t]here is no rational basis for, nor legitimate government interest supporting, HPD's refusal" to award funding based on current value, and that HPD's conduct was "based on an intent to inhibit or punish" plaintiffs.  (PAC ¶¶ 89–90; see also Pls.' Mem. at 6–7).  Plaintiffs further allege that the defendant's malintent is evidenced by the fact that that HPD "lied to Mayor De Blasio and other City officials" about HPD's support for the project (PAC ¶ 90) and by the fact that "sale of the lot to another developer will not result in any savings to the City, and in fact may increase the cost of the project due to the changing of sponsors" (Pls.' Reply at 6 (quoting PAC ¶ 69)).  Plaintiffs also allege that HPD, under the direction of Emily Lehman, had come to prefer an alternative use for the property, such as a "homeless shelter" or "transit hotel."  (PAC ¶ 40).

Neither HPD's apparent change in position with respect to the best use for the property, nor the allegation that HPD lied about its prior support for the Project, nor the fact that the funding determination may ultimately result in a net loss to the City indicate that HPD's decision not to waive the Policy was the consequence of malice or ill will towards CCMS.  See Airday v. City of New York, No. 14 CV 8065, 2020 WL 4015770, at *5 (S.D.N.Y. July 16, 2020) (noting that "impermissible motivation[s]" for purposes of a selective enforcement claim include discrimination on the basis of race, suppressing a constitutionally protected activity, or personal malice").  As defendant rightly points out, HPD's alleged conduct could just as easily be understood as the consequence of other legitimate governmental policies (Def.'s Mem. at 14–15), and the Proposed Amended Complaint includes no allegations to the contrary aside from conclusory allegations of HPD's "malicious[ness]" or "bad faith intent," which do not suffice to

17

make out a claim of selective enforcement, Bristol v. Town of Camden, 669 F. Supp. 3d 135, 154–55 (N.D.N.Y. 2023); see also Lilakos v. New York City, 808 F. App'x 4, 8 (2d Cir. 2020).

Moreover, plaintiffs' allegation that "HPD's intent is to punish CCMS for having complained about its policy with respect to acquisition costs" (PAC ¶ 69) makes no sense. Plaintiffs do not allege that they had complained about the Policy or HPD's discretion with respect thereto prior to the Jean's Place saga, and HPD's acquisition cost determination is precisely the conduct that plaintiffs claim was discriminatory. That determination could not have been motivated by plaintiffs' *subsequent* complaints about said determination.

Based on the foregoing, the Court finds that plaintiffs have not adequately alleged an equal protection claim based on a selective enforcement theory.

### 2.   Class-of-One Theory

The Proposed Amended Complaint also fails to allege a valid class-of-one discrimination claim. In order to state such a claim, plaintiffs must allege that they were "treated differently" from others, that there is "an extremely high degree of similarity between . . . plaintiff[s] and [the] comparator," and that "there is no rational basis for the difference in treatment." Hu v. City of New York, 927 F.3d at 91, 93. Here, plaintiffs identify as their comparator not another developer or service provider but, rather, two previous CCMS supportive housing projects. (Pls.' Mem. at 7 (citing PAC ¶¶ 13–18, 57, 62)).

The district court previously rejected plaintiffs' reliance on these comparators on the ground that plaintiffs had not provided sufficient "details showing that the comparators are similarly situated." (Order at 9 (quoting Contiguous Towing, Inc. v. State, 202 F. Supp. 3d 269, 276 (E.D.N.Y. 2016))). Responding to the district court's order, the Proposed Amended Complaint includes new allegations about these two prior projects—Ruby's Place and Georgia's Place—both of which received financing from HPD based on the current appraised value, not

purchase price.  (PAC ¶¶ 15–16).  Plaintiffs claim that both of these projects "have 'an extremely high degree of similarity' to the Jean's Place project."  (Pls.' Mem. at 7 (quoting Hu v. City of New York, 927 F.3d at 93)).  Defendant principally argues that to the extent plaintiffs are relying on how HPD treated them in the past, these allegations do not support an equal protection claim, as CCMS's own projects are not valid comparators.  (Def.'s Mem. at 13 (citing Carruth v. Bentley, 942 F.3d 1047, 1058–59 (11th Cir. 2019), and MOJO Built, LLC v. City of Prairie Village, No. 20 CV 2407, 2021 WL 826239 (D. Ks. March 4, 2021), aff'd on other grounds, 2021 WL 826239 (10th Cir. 2022))).

As plaintiffs correctly note, "[n]othing in the Second Circuit's Hu decision suggests that these prior projects cannot serve as relevant comparators in this matter."  (Pls.' Reply at 4).  However, defendant cites persuasive out-of-circuit cases that prohibit a plaintiff from using itself as a comparator in equal protection cases.  In Carruth v. Bentley, the Eleventh Circuit surveyed the relevant caselaw and found no support for a plaintiff's attempt to use an earlier version of himself as a comparator in a class-of-one equal protection claim, and thus held that his reliance on such a comparator was "fatal to [his] claim."  942 F.3d at 1058–59.  The Eleventh Circuit's decision in Carruth emphasized the requirement that plaintiffs relying on a class-of-one theory must have been "intentionally treated differently from *others similarly situated*."  942 F.3d at 1059 (emphasis added) (quoting Village of Willowbrook v. Olech, 528 U.S. at 564).  The Eleventh Circuit concluded that the Supreme Court's use of "others" in Olech "naturally suggests that a plaintiff must point to someone else."  Id.  Similarly, in MOJO Built, LLC v. City of Prairie Village, the district court held that a plaintiff challenging a city's denial of a rezoning application could not point to a prior version of itself simply because a different rezoning

19

application was approved by the city because "[t]he standard applied in equal-protection cases . . . contemplates the existence of a third-party to compare against." 2021 WL 826239, at *5.[11]

While this Court is not aware of any Second Circuit precedent directly applicable to this issue, and the parties have not presented any, the reasoning in Carruth and Mojo Built, LLC is consistent with the Second Circuit's decisions. In Hu v. City of New York, for example, the Second Circuit noted that both class-of-one and selective enforcement claims "require a showing that the plaintiff was treated differently from *another* similarly situated comparator." 927 F.3d at 93 (emphasis added). As with the Supreme Court's use of "other" in Olech, the Second Circuit's language in Hu suggests that plaintiffs are required to identify a third party as their comparator. Based on that language and the language used in equal protection caselaw more generally, the Court concludes that plaintiffs here cannot rely on their two prior projects as comparators for purposes of a class-of-one claim.

Even if they could, the Ruby's Place and Georgia's Place projects are not sufficiently similar to the Jean's Place Project to serve as comparators. The standard of similarity for class-of-one claims articulated in Hu requires plaintiffs to demonstrate that they and the comparators "are *prima facie* identical by showing that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." 927 F.3d at 93 (quoting Neilson v. D'Angelis, 409 F.3d 100, 105 (2d

---

[11] The Tenth Circuit affirmed the district court's decision but ultimately did not reach the question of whether the plaintiff could use itself as a comparator. However, the panel did note that the Eleventh Circuit, the "only court to have discussed this argument[,] was profoundly skeptical." Mojo Built, LLC v. City of Prairie Vill., No. 21 CV 3054, 2022 WL 288139, at *2 n.2 (10th Cir. Feb. 1, 2022) (citing Carruth v. Bentley, 942 F.3d 1047).

Cir. 2005), overruled on other grounds, Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2008)).

Plaintiffs have not met this standard.

First, as defendant points out and plaintiffs admit, neither Ruby's Place nor Georgia's Place sought or received SARA financing.  (Def.'s Mem. at 13; Pls.' Reply at 5).  Plaintiffs claim that this is "of no moment," because both projects were "funded by HPD," and plaintiffs "challenge[] the HPD's acquisition cost policy across the board."  (Pls.' Reply at 5). This assertion does not, however, accurately characterize the nature of the Proposed Amended Complaint.

Plaintiffs' core claim, as stated in the Proposed Amended Complaint, is that HPD violated plaintiffs' rights when it chose not to waive the "lesser of" provision of the Policy when determining the funding for the Jean's Place Project.  Plaintiffs specifically allege that "the rules governing the *SARA program*" provide HPD with the discretion to "amend or waive compliance with any terms of the SARA program including determination of 'acquisition cost,'" and that it is HPD's refusal to exercise that discretion here with which plaintiffs take issue.  (PAC ¶ 60 (emphasis added)).  Plaintiffs have not identified any other "HPD[] acquisition cost policy" (Pls.' Reply at 5), aside from the one applicable to the SARA Program, leaving the Court to assume that the policy referred to throughout the Proposed Amended Complaint is the one set out in HPD's SARA Program term sheet.  (See HPD SARA Term Sheet (ECF No. 21-6) at 8). Moreover, plaintiffs have not alleged any facts addressing whether the policy applicable to non-SARA projects funded by HPD is the same as the one that HPD applied to Jean's Place. Plaintiffs have therefore failed to establish that the three projects were subject to a sufficiently similar policy for purposes of their class-of-one claim.

Second, CCMS first began work on the Jean's Place Project in early 2015, when Hodges was director of HPD's Supportive Housing Loan Program.  Hodges left that role in June 2015, and HPD's involvement in the Project was then led by Ms. Lehman, who had moved up within the agency.  (See PAC ¶¶ 11, 28, 31–32, 37).  Ruby's Place was developed between 2009 and 2013 (in coordination with Hodges), and Georgia's Place was developed even earlier, between 1999 and 2004.  (Id. ¶¶ 15–16).  Thus, the difference in treatment between Jean's Place and the two alleged comparator projects may well have been nothing more than the consequence of "legitimate government policy," Neilson v. D'Angelis, 409 F.3d at 105, such as a change in policy priorities within HPD, particularly after Hodges' departure.  Critically, plaintiffs have not alleged any facts suggesting otherwise.

Finally, the delta between the purchase price and appraisal value of Jean's Place is significantly larger than it was for the other two projects.  CCMS acquired the Georgia's Place property for $190,000, and the project was funded at an appraised value of $300,000—an increase of $110,000 (or about 57.9%) over the purchase price.  (PAC ¶ 16).  CCMS acquired the Ruby's Place property for $1.4 million, and the project was funded at an appraised value of $1.875 million—an increase of $475,000 (or about 33.9%) over the purchase price.  (Id. ¶ 15).  The Jean's Place site, however, was acquired for $975,000 and was appraised at $7.5 million at the time CCMS requested that HPD waive the Policy and recognize the appraised value of the property for purposes of SARA financing.  (PAC ¶¶ 49, 52, 56).  Waiving the "lesser of" provision of the Policy for Jean's Place thus would have increased the amount of financing for that project by more than $6.5 million, or approximately 669% of the purchase price.[12]  Plaintiffs

---

[12] The Proposed Amended Complaint does not state when exactly CCMS made its funding request to HPD. (See PAC ¶ 56).  While other allegations suggest that CCMS did so when the property was still appraised at $7.5 million, plaintiffs also state that the property was re-appraised at $6.9 million in January 2022, before the Complaint was filed, and again at $5.7 million in September 2023, after the Complaint was filed.  (Id. ¶¶ 49, 52).  Even if the

wholly ignore the possibility that the disparity in HPD's decisions is explained, at least in part, by the sizeable difference in both dollar value and percent increase between the purchase price and appraised value of Jean's Place as compared to the other two projects.

Ultimately, this Court cannot ignore these differences in timing, personnel, and project value, as any one of these facts alone is enough to conclude that the three projects are not "*prima facie* identical," and thus that they are not sufficiently similar to support a class-of-one theory. Neilson v. D'Angelis, 409 F.3d at 105.[13]   Accordingly, the Court finds that plaintiffs also have not stated a class-of-one equal protection claim.

C.    Plaintiffs' Direct Challenge to the Policy as Unconstitutional

As for plaintiffs' First Cause of Action, which challenges the Policy itself as unconstitutional,[14] defendant argues that plaintiffs have failed to allege any facts to support their request for a declaration that the formula giving HPD the discretion to rely on the lesser of the acquisition cost or the current value is unconstitutional either on its face or as applied.  (Def.'s Mem. at 10).   The Court agrees.   Plaintiffs have neither articulated a constitutional violation aside from those rejected above, nor have they alleged additional facts supporting the conclusion that the Policy itself violates the Equal Protection or Due Process Clauses of the Fourteenth Amendment.   Plaintiffs therefore should not be permitted to proceed with their direct challenge to the Policy.

---

property was appraised at $6.9 million at the time CCMS made its funding request, this Court's assessment of the similarity between Jean's Place and the alleged comparator projects would not change.

[13] Plaintiffs also argue that, given the early stage of this litigation, they should be allowed to develop evidence of additional comparators. (Pls.' Reply at 5 (citing Kassner v. 2nd Ave. Deli., Inc., 496 F.3d 229, 237 (2d Cir. 2007))).  However, the authority cited by plaintiffs pre-dates the Supreme Court's decision in Ashcroft v. Iqbal, which held that a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  556 U.S. 662, 678 (2009).  Plaintiffs have not satisfied that standard here, and in the absence of any allegations suggesting that plaintiffs are likely to discover other, valid comparators, there is no basis for permitting them to proceed to discovery in order to do so.  See Mario Badescu Skin Care, Inc. v. Sentinel Ins. Co., 2023 WL 6567266, at *3.

[14] Defendant does not concede, but only assumes for purposes of argument, that the SARA program's "lesser of" term for financing determinations amounts to a "policy."  (Def.'s Mem. at 10).

<u>CONCLUSION</u>

Having reviewed the allegations in the Proposed Amended Complaint and considered the parties' arguments, the Court finds that plaintiffs have failed to sufficiently allege any of their claims under the Due Process Clause or Equal Protection Clause.  Accordingly, the Court respectfully recommends that plaintiffs' Motion to Amend be DENIED as futile and that this case be dismissed with prejudice.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); <u>see also</u> Fed. R. Civ. P. 6(a) (providing the method for computing time).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  <u>See, e.g.</u>, <u>Caidor v. Onondaga Cnty.</u>, 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      August 18, 2024

_Cheryl L. Pollak_
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

24